**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MICHAEL R.,**

        **Plaintiff,**

v.                                 **Civil Action 2:22-cv-4117
Chief Judge Algenon L. Marbley
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Michael R., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 11) and **AFFIRM** the Commissioner's decision.

**I.**      **BACKGROUND**

On February 25, 2020, Plaintiff protectively filed an application for DIB alleging disability beginning March 3, 2018. (R. at 257–58). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on October 28, 2021. (R. at 38–61). The ALJ denied Plaintiff's application in a written decision on December 3, 2021. (R. at 12–32). When the Appeals Council denied Plaintiff's request for review, that denial became the final decision of the Commissioner. (R. at 1–7).

Next, Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record (Doc. 8), and the parties briefed the issues. (Docs. 11, 13, 14). The matter is ripe for review.

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as follows:

[Plaintiff] alleged disability due to PTSD, neck injury, chronic deterioration of the vertebrates in his neck and back, cervical strain, wedge compression fracture at L1 vertebrae, arthritis in his neck and back, hypertension, anxiety, and depression (Exhibits 1E, 3E, 5E, 8E; Disability Hearing). [Plaintiff] testified he stopped working on March 3, 2018, when he was involved in a motor vehicle accident. He testified he is unable to work because he does not think he would be unable to make it to a job because of his PTSD and severe anxiety; he testified that any time he tries to drive it takes him a couple days to get ready to make the trip, he has severe anxiety during the trip and has to pull over and use techniques he learned in therapy to calm himself down, and he cannot sleep for days afterwards secondary to "visions from the accident". [Plaintiff] testified he attends mental health appointments via telehealth secondary to his anxiety and PTSD related to driving. He testified his EMDR treatment is in the "early stages", he has not noticed much benefit from it, and they have had to cut a few treatment sessions short because the sessions involve "a lot of reliving the incidence" and put him "in a place where he can't go on."

He testified his anxiety is also triggered when watching "Ice Road Truckers". He testified he suffers from anxiety daily, and the calming techniques he learned in therapy sometimes work and sometimes do not. He testified that it is "impossible" for him to ride in a car with someone else driving. He testified he is able to drive to the grocery store (3 miles away), but he limits his trips because it causes him anxiety 1-2 days afterwards. He testified it "bothers [me] less" to drive short distances and he does not have to prepare himself to go to the grocery store (he "just goes").

He testified he has physical injuries that prevent him doing tasks around the house, but the inability to drive is the most significant aspect that prevents him working because pulling over the side of the road makes him a danger to himself and other drivers. He testified he fractured his L1 vertebrae, which Worker's Compensation denied because it did not occur during the accident. He testified he also has nerve damage that is not covered by Worker's Compensation because it has not been confirmed; thus, he is unable to get treatment for this. He testified he has cervical strain and deterioration in his neck that causes numbness and pain in his neck and back and causes headaches, which happens a lot when he drives. He testified he was given "maximum medically improved" status. He testified that hyper-vigilance from PTSD made him look side to side more when driving and this exacerbated his headaches.

(R. at 22).

### B. Relevant Medical Evidence

2

The ALJ also discussed Plaintiff's medical records and symptoms related to his mental health impairments as follows:

> *** [O]utpatient medical examination records documented physical and mental status examinations that evidenced some abnormal findings that are consistent with [Plaintiff]'s severe impairments, including pain with full range of motion of the shoulders, decreased range of motion and strength of the shoulders, decreased strength of the hips, decreased strength of the knees on extension, tenderness of the cervical spine and cervical paraspinals muscles, muscle spasms of the bilateral upper trapezius, decreased range of motion of the cervical spine, decreased range of motion of the shoulders, decreased range of motion of the lumbar spine, decreased sensation to pinprick at the front left thigh and left heel, decreased memory, difficulty concentrating, depressed mood, and affect appropriate with mood (Exhibits 1F, 2F, 3F, 5F-8F, 10F, 13F-18F, 20F).  He complained of difficulty concentrating, fatigue, feelings of losing control, insomnia, irritability, palpitations, racing thoughts, and hopelessness, as well as severe anxiety when driving and difficulty being a passenger in a vehicle (Exhibits 3F, 12F-14F, 16F-18F, 20F).  The psychological testing in March 2020 revealed severe anxiety and depression, but [Plaintiff] was not utilizing any psychiatric medications (Exhibit 6F).
>
> ***
>
> [Plaintiff] has continued mental health treatment, and while his treatment records do not show whether he pays out-of-pocket or through insurance, they document his statements that he drives his wife to Columbus for MS treatment, indicating she has medical insurance.  Dr. Koricke noted in February 2021 that [Plaintiff] attended only one behavioral therapy session on October 28, 2019 with Amanda Sevcik, LISW; although [Plaintiff] attended only one session in October, she had a total of four behavioral health sessions for PTSD with Ms. Sevcik from September to December 2019 (Exhibits 3F, 20F).  There are no clinical notations explaining the large gaps in treatment or why treatment ended with Ms. Sevcik (*Id.*).

(R. at 23–25).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through December 31, 2023, and has not engaged in substantial gainful activity since March 3, 2018, the alleged onset date. (R. at 18). The ALJ determined that Plaintiff has the following severe impairments: closed compression lumbar fracture; degenerative disc disease; hypertension; neck strain; posttraumatic

3

stress disorder (PTSD); generalized anxiety disorder; major depressive disorder. (*Id.*). Still, the ALJ found that, Plaintiff's impairments, either singly or in combination, do not meet or medically equal a listed impairment. (R. at 19).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ concluded:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can stand and walk 6 of 8 hours; sit 6 of 8 hours; lift 20 pounds occasionally and 10 pounds frequently; could climb, stoop, kneel, crouch, or crawl occasionally; could not require driving or riding in a motor vehicle as a requirement of the job; would be limited to simple, routine 1-3 step instructions; in a low stress environment, defined as no quick decision making and no quick judgment required on the job; no interaction with the public and only occasional interactions with co-workers and supervisors; would be unable to perform jobs that are fast pace, high production, or frequent changes in task expectations or locations.

(R. at 21).

Relying on the vocational expert's testimony, the ALJ found that Plaintiff is unable to perform his past relevant work as a CDL driver or a delivery paper driver. (R. at 30–31). Considering his age, education, work experience, and RFC, however, there were jobs that exist in significant numbers in the national economy that Plaintiff can perform at the light exertional level, such as a merchandise marker, garment sorter, or warehouse checker. (R. at 31–32). The ALJ thus concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since March 3, 2018. (R. at 32).

## II.   STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

4

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### III. DISCUSSION

In his Statement of Errors, Plaintiff contends that the ALJ violated 20 C.F.R. § 404.1520c during her evaluation of the medical source statement completed by Joy Riffle, LISW and the prior administrative medical findings from the state agency psychologists, Dr. Murray-Hoffman and Dr. Rivera, by failing to properly evaluate their opinions for consistency and supportability. (Doc. 11 at 10–20). The Commissioner counters that in crafting Plaintiff's RFC, the ALJ adequately evaluated their opinions pursuant to the regulations and the residual functional capacity was based on the evidence of record. (Doc. 13 at 4–14).

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in her or her case file. *Id*. The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical

findings.[1]  20 C.F.R. § 404.1513(a)(1)–(5).  Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources."  20 C.F.R. § 404.1520c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements."  § 404.1520c(c)(1)–(5).  Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered.  § 404.1520c(b)(2).

When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion.  20 C.F.R. § 416.920c(c)(1).  When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion.  20 C.F.R. § 416.920c(c)(2).  And although an ALJ may discuss how she evaluated the other factors, she is not generally required to do so.  Id.  If, however, an ALJ "find[s] that two or more medical opinions or prior administrative findings about the same issue are both

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 404.1513(a)(2), (5).

6

equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ will] articulate how [he or she] considered the other most persuasive factors . . . ." § 404.1520c(b)(3).

At bottom, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). The role of the Court is not to reweigh the evidence, but to make sure the ALJ considered the proper factors and supported her conclusion with substantial evidence. *Id.,* at *14.

### A. Joy Riffle, LISW

The ALJ found Ms. Riffle's opinion on Plaintiff's ability to do work related mental activities not persuasive. (R. at 29). When evaluating Ms. Riffle opinion, the ALJ determined:

> [The ALJ] considered the opinion of Joy Riffle, LISW and I find her opinion is not persuasive because her assessment appears to be based on [Plaintiff]'s subjective reporting of his limitations and pain symptoms, is not supported by her clinical treatment records and is not consistent with the totality of the evidence, including the consultative psychological examination, [Plaintiff]'s function report statements, and other clinical records in evidence, which reflects greater activities of daily living and mental and physical functioning than to which he reported to Ms. Riffle (Exhibit 19F; See Exhibits 3E; 14F/29; ). Importantly, Ms. Riffle specify that "chronic pain affects mental health significantly", but as discussed above, the medical evidence of record does not support the chronic pain [Plaintiff] reported to Ms. Riffle, especially in light of his lack of outpatient medical treatment after 2019 and lack of urgent care or ER treatment for intractable pain despite the lack of use of any pain medications. Therefore, the medical evidence of record does not support the effects of [Plaintiff]'s reported pain symptoms on his mental health as Ms. Riffle opined. In contrast to [Plaintiff]'s reported limitations in functioning secondary to PTSD and anxiety, as well as limitations secondary to depression that he reported to Ms. Riffle during his psychotherapy sessions, the activities he documented in his function report reflects less significant "barriers to attendance, focus, problem-solving, social/work interaction" than to which Ms. Riffle opined (See Exhibit 3E). Although she stated, "Attendance is not going to be conducive to maintaining employment due to severe anxiety from PTSD," and that he would miss more than four days of work per month, this appears to be based on [Plaintiff]'s reported difficulties with driving, since his therapy took place via telehealth appointments (Exhibit 19F; See Exhibits 8F, 10F,

7

>13F, 14F, 16F-18F; Disability Hearing).  [Plaintiff]'s function report and testimony, the consultative psychological examination summary, and various portion of the mental health records documented [Plaintiff]'s continued ability to drive after the alleged period of disability (Exhibits 3E, 3F, 7F, 14F; Disability Hearing).

(R. at 29–30).

Plaintiff argues the ALJ did not fully consider the supportability or consistency of Ms. Riffle's opinion. (Doc. 11 at 10).  First, regarding supportability, Plaintiff alleges the ALJ did not consider Ms. Riffle's objective treatment notes in concluding that her opinion was not supported. (Doc. 11 at 14–15).  As explained below, the Undersigned disagrees.  The ALJ properly evaluated the supportability of Ms. Riffle's opinion given the lack of objective evidence in the opinion itself and when compared to Ms. Riffle's past treatment notes.

The ALJ found Ms. Riffle's opinion not persuasive, in part, because she understood Ms. Riffle's assessment to be based upon Plaintiff's subjective reports of his symptoms of pain and his limitations.  (R. at 29).  Ms. Riffle's opinion of Plaintiff's ability to do work-related mental activities was completed on a checklist form.  (R. at 781–82).  On the checklist form, she rated Plaintiff "seriously limited" or "unable to meet competitive standards," or "no useful ability to function" on twenty-four mental abilities and aptitudes related to work.  (*Id.*).  By way of explanation, she offered only a brief narrative about the suggested limitations at the end of the form, describing that, "[c]hronic pain effects mental health significantly.  Client struggles with significant PTSD symptoms that are a barrier to attendance, focus, problem solving, social/work interactions" and "[t]he level of mental health symptoms is very significant for this client. Attendance is not going to be conducive to maintaining employment due to severe anxiety from PTSD."  (R. at 782).  She lastly checked a box that indicated that Plaintiff on average would be absent from work more than four days per month.  (*Id.*).

Courts in this Circuit have evaluated the limitations of checklist-type medical opinions that include little or no explanation or citations to objective evidence supporting a limitation finding. *See Lorraine S. v. Comm'r of Soc. Sec.*, No. 2:22-CV-2257, 2022 WL 17335383, at *7 (S.D. Ohio Nov. 30, 2022) (finding the ALJ's determination that a medical opinion was not fully supported was properly considered when the opinion was in checklist form with little narrative explanation and no explanation or citations to the Plaintiff's medical records), *report and recommendation adopted*, No. 2:22-CV-2257, 2023 WL 5349521 (S.D. Ohio Aug. 21, 2023); *Pettigrew v. Berryhill*, No. 1:17-CV-01118, 2018 WL 3104229, at *13 (N.D. Ohio June 4, 2018) ("Numerous decisions have found that the use of checklist or check-the-box forms that contain little to no accompanying explanation for the assessed limitations—even when utilized by a treating physician or acceptable medical source—are unsupported opinions . . . .") (citing *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 630 (6th Cir. 2016) ("Dr. Chapman's checklist opinion did not provide an explanation for his findings; therefore, the ALJ properly discounted it on these grounds.")), *report and recommendation adopted*, No. 1:17CV1118, 2018 WL 3093696 (N.D. Ohio June 22, 2018).

Similarly, Ms. Riffle did not cite to any treatment note or mental health examination record on the form that would have supported her opined mental limitations. (R. at 781–82). This type of citation would have provided the ALJ with supportive evidence that each limitation assessed was grounded in objective medical evidence—rather than subjective reports from Plaintiff. The ALJ, therefore, had support for her conclusion that "[Ms. Riffle's] assessment appears to be based on the claimant's subjective reporting of his limitations and pain symptoms" because the opinion did not provide the ALJ with Ms. Riffle's objective support for each assessed mental ability or aptitude. (R. at 29).

Likewise, Ms. Riffle's opinion that "[a]ttendance is not going to be conducive to maintaining employment due to severe anxiety from PTSD" and that Plaintiff would be absent from work more than four days per month was not supported by a citation to a treatment note or record of a past examination. (R. at 782). Therefore, the ALJ came to a reasonable conclusion that this opinion was based on Plaintiff's self-reported driving difficulties "since his therapy took place via telehealth appointments" because the opinion did not provide any objective support. (R. at 30).

Moreover, the ALJ did compare Ms. Riffle's opinion to her treatment records of Plaintiff when the ALJ highlighted that Plaintiff's subjective reporting of his limitations and symptoms in the opinion "were not supported by [Ms. Riffle's] clinical treatment records . . . ." (R. at 29). The ALJ cited to Ms. Riffle's treatment notes that indicated the Plaintiff was preparing to drive to Columbus for his wife's medical treatment. (*Id.*) (citing R. at 667). The ALJ found that this, among other medical evidence of record, "reflects greater activities of daily living and mental and physical functioning than what [the Plaintiff] reported to Ms. Riffle." (*Id.*).

Accordingly, the ALJ examined Ms. Riffle's opinion and found it not fully supported due to a lack of citation to objective evidence in the opinion itself and due to the opinion not being supported by aspects of Ms. Riffle's previous treatment records. For that reason, the ALJ appropriately considered the supportability of Ms. Riffle's opinion and sufficiently explained her decision that the opinion was not supported.

Plaintiff further alleges the ALJ did not fully consider the consistency of Ms. Riffle's opinion with the rest of the record. (Doc. 11 at 10). In particular, Plaintiff says the ALJ took a "narrow view" of the record to conclude that the opinion was inconsistent. (*Id.* at 15). However, the ALJ highlighted several instances in which Ms. Riffle's opinion was inconsistent with the other

evidence of record. And, taken together, these instances were substantial evidence upon which the ALJ reasonably concluded that the opinion was inconsistent with the record as a whole.

For instance, the ALJ noted that Ms. Riffle's opinion that "chronic pain affects mental health significantly" was not consistent with the record as a whole, which failed to show chronic pain to the severity Ms. Riffle suggested. (R. at 29) (citing R. at 782). Particularly, the ALJ highlighted that despite not using pain medication, Plaintiff did not seek outpatient medical treatment after 2019 and did not seek urgent care or ER treatment for pain. (*Id.*). This follows elsewhere in her opinion where the ALJ explained that Plaintiff experienced significant improvement in symptoms after attending physical therapy from April to August 2018 and that he "stopped performing his home exercise program." (R. at 24) (citing R. at 367–480); (*see* R. at 466) (December 2018 examination noting that "[Plaintiff] says the physical therapy he received had helped . . . significantly. However he stopped doing the home exercise program instructed about 1 one month ago due to ineffectiveness."). The ALJ further found that "[t]he pain levels documented in those clinical records support [Plaintiff's] statement . . . about the effectiveness of physical therapy." (R. at 24). Indeed, treatment notes from April and May 2018 show Plaintiff regularly reporting pain in his neck and low back between a five and seven on a ten-point pain scale. (*See, e.g.*, R. at 397, 406, 409, 412). But later records show that pain ratings improved with physical therapy. (R. at 436) (June 28, 2018 physical therapy note in which Plaintiff rates pain at two or three in neck, two in low back, and describes that he is "interested in getting back to therapy routine as finds he has made a lot of progress."); (R. 440) (July 5, 2018, pain at four in neck, described as a flare up, one or two in low back); (R. at 452) (July 24, 2018, pain at three or four in both neck and low back).

11

In addition to the improvement of pain with physical therapy, the ALJ considered the absence in the record of medical treatment after 2019 related to chronic pain to contradict Ms. Riffle's opinion that chronic pain symptoms significantly affect Plaintiff's mental health. (R. at 29). For example, the ALJ noted that while "[i]n May 2019, William Chang, MD referred [Plaintiff] to a pain management specialist, [ ] there is no evidence [Plaintiff] followed through with that referral . . . ." (R. at 24).

Furthermore, the ALJ noted the limitations Plaintiff reported to Ms. Riffle during his psychotherapy sessions from symptoms related to PTSD, anxiety, and depression were inconsistent with activities Plaintiff documented in his function report and in other clinical records. (R. at 30) (citing R. at 301–10, 666). Elsewhere in the decision, the ALJ considered these activities in detail, which included Plaintiff's ability to "perform personal care activities independently, prepare meals, cook, clean, mow the lawn, grocery shop, handle his finances, attend appointments, and drive." (R. at 20) (citing R. at 301–10). The ALJ concluded that these activities reflect "less significant 'barriers to attendance, focus, problem-solving, social/work interaction' than to which Ms. Riffle opined." (R. at 30) (citing R. at 782).

Finally, the ALJ found Ms. Riffle's opinion that Plaintiff's "[a]ttendance is not going to be conducive to maintaining employment due to severe anxiety from PTSD" and that he would be absent from work more than four days per month inconsistent with Plaintiff's function report and testimony, the consultative psychological examination summary, and other mental health records, all of which detail the Plaintiff's "continued ability to drive after the alleged period of disability." (R. at 30). As documented elsewhere in her findings, the ALJ highlighted that these records indicated that Plaintiff drives or rides as a passenger in a car to the grocery store, to visit his mother, to take his wife to get medical treatment, to remodel his aunt's home, to attend a songwriter's

group, and to go on hunting and fishing trips. (R. at 26) (citing R. at 52–53, 306–307, 489, 789). As such, the ALJ observed that this evidence was inconsistent with Ms. Riffle's opinion that Plaintiff would miss more than four days of work per month due to anxiety from PTSD related to driving to work. (R. at 30).

All this shows that the ALJ properly considered the consistency of Ms. Riffle's opinion with the rest of the record, and the ALJ sufficiently explained why the opinion was not consistent with other aspects of the record.

In sum, the ALJ evaluated both the supportability and consistency of Ms. Riffle's opinion and detailed the evidence underlying the finding that the opinion was not persuasive. As such, the ALJ satisfied the requirements of the regulations. *See* 20 C.F.R. § 404.1520c(b)(2).

### B. State Agency Psychologists

The ALJ found the state agency psychological consultants' opinions of Plaintiff's mental functional limitations for work activities only somewhat persuasive. (R. at 27). The ALJ concluded Dr. Murry-Hoffman and Dr. Rivera's assessments of the B criteria were persuasive to support limitations in four broad areas of mental functioning, as the opinions were "consistent with the substantial evidence of record." (R. at 27) (citing R. at 136, 146). Specifically, the ALJ found Plaintiff has a "moderate limitation in understanding, remembering or applying information, a moderate limitation in interacting with others, a moderate limitation in concentrating, persisting, or maintaining pace, and a moderate limitation in adapting or managing oneself." (R. at 20). However, the ALJ was not persuaded by the state agency psychologists' opinions that Plaintiff required a flexible break schedule or should be limited to only superficial interactions with others in the workplace. (R. at 27).

When evaluating the opinions of the state agency reviewing psychologists, the ALJ

determined:

> I considered the opinions of the state agency psychological consultants and I find their assessments of the B criteria are persuasive as they are consistent with the substantial evidence of record, including the claimant's function report, the mental health records, the consultative psychological examination, and the other medical records in evidence, which supports moderate limitations in the four broad areas of mental functioning (Exhibits 2A, 4A). However, I find their assessments of the claimant's mental functional limitations for work activities are not wholly consistent with the claimant's reported activities of daily living nor his interactions with others documented in the clinical records and, therefore, this portion of their opinions are only somewhat persuasive. Specifically, Dr. Murray-Hoffman and Dr. Rivera opined the claimant would benefit from a flexible brick scheduled to permit breaks when most needed and is capable of superficial interactions with others in the workplace, explaining that the claimant reported difficulty with concentrating, 50, feelings of losing control, insomnia, irritability, palpitations, racing thoughts, and hopelessness and that he feels debilitated by his symptoms (Exhibits 2A, 4A). In contrast to their opinions and supportive explanations, the claimant stated in his function report that he plays guitar often, occasionally goes fishing and hunting, plays music with friends when they visit him, and attends a songwriter's group once a month, which are activities that reflects the ability to concentrate, persistence or maintaining pace and much greater level than opined by the state agency psychological consultants and would not support their opinion that he would need a flexible brick scheduled to permit breaks when needed (Exhibit 3E). He also stated that the only thing that changed with his ability to handle his finances (paying bills, counting change, handling a savings account, and using a checkbook/money orders) is the amount of money he has, which indicates that his ability to concentrate and persist when handling his finances have not changed (Id.). However, based on his testimony and function report and the mental health records, he drove his wife three hours to Columbus for her MS treatments, he drove to the consultative psychological examination, he drives to the grocery store, he either drives or is a passenger in a vehicle to get to his aunt's house, to his songwriter's meetings, and to his fishing and hunting sites. As such, given the residual functional capacity precludes driving and being a passenger in a vehicle as a requirement of the job, the record, as a whole, does not support the finding that he would have anxiety when arriving to the job that would require him to have a flexible break period.

(R. at 27).

At the outset, the Undersigned notes the inherent lack of clear delineation between supportability and consistency when an ALJ evaluates the opinion of a reviewer—like a state agency physician—who forms her opinion after a holistic review of the medical evidence of

record. Consider, for example, a case in which there has been little or no change to the medical evidence of record between the time the reviewer issues her finding and the ALJ conducts a hearing. In that instance, the evidence upon which the reviewer supported her finding—the complete medical record at the time of her finding—would be virtually identical to the evidence with which the opinion is consistent or inconsistent—the complete medical record at the time of the ALJ's hearing. The ALJ is left in a position in which she is unable to consider supportability without simultaneously addressing consistency, and vice versa. A plaintiff might semantically allege error in such a case—saying that the ALJ only addressed consistency because she compared the reviewer's opinion to the entirety of the record. But the ALJ would have still fulfilled the purpose of the regulation: to give a fulsome review to medical opinions and prior administrative findings, paying particular attention both to how the opinions are internally supported and explained, and how they compare to the record as a whole.

Contrast this with a medical opinion rendered by a treating physician. There, supportability and consistency are more clearly distinguished. The physician supports (or not) her opinion with her own treatment notes, objective medical findings, and experience with the plaintiff. Her opinion is consistent (or not) with the entire universe of the medical evidence of record.

Other courts in this Circuit have considered this facet of the supportability/consistency framework. In *Vaughn v. Commissioner of Social Security*, the Western District of Tennessee addressed an allegation that an ALJ had not properly assessed the supportability of opinion evidence provided by a physician acting as a "reviewing specialist[ ] . . . ." No. 20-cv-1119-TMP, 2021 U.S. Dist. LEXIS 134907, at *24 (W.D. Tenn. July 20, 2021). The court found that consistency had sufficiently been addressed by the ALJ, because she explicitly detailed why the

15

opinion was inconsistent with other aspects of the record. *Id.* at *25–27. But, the ALJ had not meaningfully discussed supportability. *Id.* at *27–32.

Notably, however, the physician based his opinion on other medical records "he reviewed, which completely encompasse[d] the relevant period of discovery." *Id.* at *30–31. In other words, the physician operated in the manner of a state agency reviewer, conducting a holistic review of the medical evidence of record before rendering an opinion. So, the court determined that while the ALJ had not observed 20 C.F.R. § 404.1520c to the letter, she had:

> achieved the regulations' goal of providing notice to [the plaintiff] of why [the physician's] opinion was not persuasive. [The physician]'s opinion was entirely predicated on a review of [the plaintiff]'s medical history and, when recounting that same medical history, the ALJ identified several instances where [the plaintiff]'s medical records did not support a finding of disability. As such, the ALJ's discussion of [the plaintiff]'s medical history is, in essence, a discussion of whether the evidence [the physician] reviewed could actually support his conclusions. Thus, while not being a direct attack on the supportability of [the physician]'s opinion as contemplated by the regulations, the ALJ's opinion is only one step removed from articulating why she believed the basis for [the physician]'s opinion was faulty, i.e. an explanation of the supportability factor.

*Id.* at *34–35. Accordingly, the court concluded that any error in the assessment of the opinion was harmless and remand was not necessary. *Id.* at *36.

This same harmless-error analysis should apply to an ALJ's decision which clearly discusses the consistency of a state agency reviewer's opinion, when that same opinion was formed upon records which encompassed the relevant period of discovery and the ALJ elsewhere discusses those records in detail.

In the present case, Plaintiff argues the ALJ did not discuss supportability in her evaluation of the psychological consultants' opinions with respect to Plaintiff's mental functional limitations for work activities. (Doc. 11 at 10). Specifically, Plaintiff alleges that the ALJ ignored the factor "completely." (*Id.* at 18). Plaintiff further alleges that the ALJ's evaluation of the consistency of the psychological consultants' opinions with respect to Plaintiff's mental functional limitations for

16

work activities was too "narrowly tailored." (*Id.* at 19).

The Undersigned finds, however, that the ALJ fulfilled her duty to evaluate both the supportability and consistency of the psychological consultants' findings. The ALJ discussed supportability where she compared the psychological consultants' opinions with the evidence they had available to them when forming their opinions. Where she compared the opinions to later evidence, which was unavailable to the psychological consultants, she discussed consistency with the evidence of record as a whole.

Dr. Murray-Hoffman completed a disability determination on October 7, 2020. (R. at 141). Part of the evidence that Dr. Murray-Hoffman reviewed in forming the opinion included Plaintiff's function report along with mental and physical health records that were available before that date. (R. at 135). Dr. Rivera completed a disability determination on January 18, 2021 and similarly reviewed Plaintiff's function report along with mental and physical health records that were available before that date. (R. at 145). The ALJ noted that both psychological consultants opined that Plaintiff would "benefit from a flexible brick scheduled [sic] to permit breaks when most needed and is capable of superficial interactions with others in the workplace" based on records indicating that Plaintiff reported "difficulty with concentrating . . . feelings of losing control, insomnia, irritability, palpitations, racing thoughts, and hopelessness . . . ." (R. at 27) (citing R. at 140, 149). Yet, the ALJ highlighted that in Plaintiff's function report, Plaintiff reported he "plays guitar often, occasionally goes fishing and hunting, plays music with friends when they visit him, and attends a songwriter's group once a month." (R. at 27) (citing R. at 307). The ALJ stated that these activities in the function report reflect Plaintiff's ability to concentrate and persist at a "greater level than opined" by the psychological consultants and that the function

17

report does not support the consultants' opinions that Plaintiff would need a flexible break schedule. (R. at 27).

Next, the ALJ pointed to the sections of the function report in which Plaintiff stated he maintained the ability to handle his finances, including paying his bills, counting change, handling a savings account, and using a checkbook. (R. at 27) (citing R. at 306–07). The ALJ found that this also reflected Plaintiff's ability to concentrate and persist at a greater level than that which the psychological consultants opined. (R. at 27). Further, the ALJ considered Plaintiff's function report and other mental health records available to the psychological consultants which indicate that Plaintiff drove to the consultative psychological exam, drove his wife three hours for medical treatment, regularly drove to the grocery store, and drove or was a passenger in a car when he went to his aunt's house, to his songwriter's meetings, and to hunting and fishing sites. (R. at 27) (citing R. at 306–07, 789, 790). The ALJ concluded that this evidence did not support Plaintiff requiring a flexible break period to address anxiety after driving to work as the psychological consultants opined. (R. at 27).

Moreover, the ALJ highlighted the function report again where Plaintiff indicated that he does not have problems getting along with "friends, family, neighbors, and others, and . . . that he gets along with people for the most part." (R. at 27) (citing R. at 308). The ALJ noted that evidence including the function report and various health records also indicated that Plaintiff spends time with friends, attends a songwriter's group, and was "cooperative and friendly and exhibited good eye contact at the consultative psychological examination." (R. at 27) (citing R. at 135, 307, 521). This, the ALJ concluded, did not support the psychological consultants' opinions that Plaintiff can only have superficial and occasional interactions with others in the workplace. (R. at 27).

Even though the ALJ used the phrase "not wholly consistent with" rather than the magic

18

word "supportability" to describe the relationship between these records and the psychological consultants' opinions, the ALJ was truly evaluating supportability because the psychologists reviewed the function report and other mental health records to form their opinions.

Given the discussion above about how supportability and consistency often overlap when an ALJ evaluates the opinions of state agency reviewers, the ALJ's thorough evaluation here of the psychological consultants' opinions when compared to the record they reviewed likely satisfies the requirements of the regulations by itself. *See* 20 C.F.R. § 404.1520c(b)(2). However, the ALJ bolstered her position when she discussed how the opinions were also inconsistent with records the psychological consultants did not have available to them. Namely, the ALJ noted that Plaintiff's testimony at his disability hearing indicated that he regularly drives to the grocery store. (R. at 27) (citing R. at 52). The ALJ also referenced a treatment record from Allwell Behavior Health Services, created after the psychological consultants formed their opinions, which reinforced that Plaintiff continued to drive his wife several hours to a recurring doctor's appointment as late as March 2021. (R. at 27) (citing R. 631). The ALJ concluded that these records were inconsistent with the psychological consultants' opinions that Plaintiff would need a flexible break period to address anxiety after driving to work. (R. at 27). So, by highlighting these instances in which the psychological consultants' opinions differed from the record as it developed after they formed their opinions, the ALJ properly evaluated the opinions' consistency with the record as a whole.

In sum, the ALJ evaluated both the supportability and consistency of the state psychological agency consultants' opinions and detailed the evidence underlying the finding that the opinions were not persuasive with respect to the certain aspects of Plaintiff's mental functional limitations for work activities. As such, the ALJ satisfied the requirements of the regulations. *See*

20 C.F.R. § 404.1520c(b)(2).

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 11) and **AFFIRM** the Commissioner's decision.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: September 21, 2023    /s/ Kimberly A. Jolson
                            KIMBERLY A. JOLSON
                            UNITED STATES MAGISTRATE JUDGE